SMITH BROS., Inc., v. O'BRYAN.

No. 9831.

Court of Civil Appeals of Texas. Galveston.

April 29, 1933.

Appellant's Motion for Rehearing Denied July 13, 1933.

Appellee's Motion for Rehearing Denied July 20, 1933.

Vinson, Elkins, Sweeton & Weems, C. M. Hightower, and W. S. Elkins, all of Houston, for appellant.

A. J. De Lange and Stewart & De Lange, all of Houston, for appellee.

LANE, Justice.

J. R. O'Bryan brought this suit against G. E. Henson and Smith Bros., Inc., to recover damages in the sum of $15,000 for personal injuries, which the plaintiff alleged he sustained as the result of a collision between an automobile owned and operated by plaintiff and a truck driven by G. E. Henson, alleged by plaintiff to have been at the time of said collision an employee of Smith Bros., Inc.

Plaintiff alleged a number of acts of negligence as the direct and proximate cause of the collision and of his injuries.

Both defendants answered by general demurrer, general denial, and a special plea of contributory negligence.

At the time of the trial, G. E. Henson was dead, and by agreement he was dismissed from the case, and the cause was prosecuted against Smith Bros., Inc., only.

The cause was submitted to a jury upon special issues. The court instructed the jury that in answering such special issues they should do so in accordance as they might find the facts to be from a preponderance of the evidence; that is, by the greater degree and weight of the credible testimony, as they might find it to be, and that they must consider the evidence in its entirety, no matter by which side adduced. The court then defined the term "proximate cause" as follows: "'Proximate cause' as that term is used in these instructions means that cause which immediately precedes and directly produces the injuries, and without which the injuries would not have happened, and the happening of which might reasonably have been anticipated as a natural and probable consequence."

In answer to the special issues submitted, the jury found that G. E. Henson was negligent in all the respects alleged by plaintiff, and that each of such acts of negligence was a proximate cause of plaintiff's injuries, and that the plaintiff was guilty of no act which approximately contributed to his injuries.

By the twenty-sixth special issue the court directed the jury to find what sum of money would be a fair and adequate compensation for the injuries alleged and proven, if any, to have been received by plaintiff, taking into consideration exclusively the following elements of damage, and none other:

"(a) Mental anguish or physical suffering, if any, by him as a direct result of such injuries, if any, by him, down to the date of the trial.

"(b) Such sum or sums of money as he may have lost because of lost time from his work, if any, as a direct result of the injuries by him received on the occasion in question, if any, from the date thereof down to the date of this trial.

"(c) The present cash value of such sum or sums of money as he may have lost in the future and beyond the date of this trial, if any, because of his diminished capacity to labor and perform work, as a direct result of the injuries received by him upon the occasion in question, if any."

In connection with special issue No. 26, the court instructed the jury that in arriving at the amount of damages inquired about they must not take into consideration any injury, physical ailment, or disability of plaintiff that was not a direct and proximate result of the collision in question.

In answer to issue No. 26, the jury answered $8,250.

Upon the findings of the jury to the several special issues, the court rendered judgment in favor of plaintiff against Smith Bros., Inc., for the sum of $8,250, and from such judgment Smith Bros., Inc., has appealed.

The appellant makes no issue of the sufficiency of the facts to establish the negligence of Henson, the truck driver, and the freedom from fault of the appellee, as found by the jury.

Appellant's first contention for reversal of the judgment is that it is shown by the undisputed evidence that G. E. Henson, the driver of the truck which was in collision with the automobile of appellee, O'Bryan, was at the time of such collision an independent contractor and not an employee of Smith Bros., Inc., and therefore the court erred in not instructing a verdict for appellant upon a request therefor by appellant; and its second contention is that, if it is in error in its first contention, then the court erred in not submitting to the jury, upon request of appellant therefor, the issue as to whether G. E. Henson, the owner and driver of the truck which collided with appellee's automobile, causing the injuries complained of, was or was not an independent contractor at the time of such collision.

At the time and for some time prior to the transactions involved in this cause Smith Bros., Inc., was engaged in a general contracting business, and in the pursuit of its work had engaged G. E. Henson, the owner of a truck, and a number of other trucks, varying in number from time to time as they were needed to haul materials from its plant on Dallas street in the city of Houston to the place where such materials were needed for its work. All of the trucks used in the work were owned by individuals other than Smith Bros., Inc. The bodies used on some of the trucks, but not on Henson's, were owned by Smith Bros., Inc., and were furnished by it. All the truck owners furnishing trucks fully equipped were paid on the same basis as those for whom bodies were furnished by Smith Bros. The trucks were loaded from a hopper located at Smith Bros.' plant, and were owned and operated by it through an employee of Smith Bros. After the respective trucks were loaded, a ticket was given to the driver designating where the load was to be delivered. Such loaded material was hauled to the place so designated by the ticket and there unloaded. After the unloading, the driver was given a ticket by an employee or agent of Smith Bros., which the driver was to return to the plant to show that the load had been delivered at the place designated for its delivery. The city of Houston was divided by Smith Bros., hereinafter for convenience called appellant, into a number of zones, and the owners of the trucks in the hauling of the materials were compensated on the basis of so much per load hauled by their particular truck. The routes used in hauling the material and the speed to be traveled were controlled by the drivers of the trucks without any supervision of appellant, except they were required to use reasonable speed in delivery of the materials. The number of loads, the specific length of time in which the men were to

work, were also determined by the drivers of the trucks, and the owners of the trucks bore all expenses of furnishing gas, lubricating oil, and repairs on the trucks incident to their upkeep and operation. If a truck broke down on a job, it was up to the owner to have it hauled in, and Smith Bros., Inc., never did on any occasion send out and haul in any broken-down truck. At times the owners of several trucks applied for work with appellant, and the owner of such trucks as were placed on the job was paid for the number of loads hauled by him. All arrangements were made with the owners of the trucks direct; and the owners could and did employ any one they desired to drive their trucks, and such drivers of the trucks were paid directly by the owners.

The owners of the trucks were paid for the number of loads hauled; it being understood, however, that, while the price per load was stipulated, the owners of the respective trucks were to receive such prices per load as to enable him to earn $1.25 per hour for the hours actually worked in the hauling of the material. All negotiations and arrangements for the hauling were made by appellant directly with the respective owners of the trucks. The owner of the truck either drove his truck or hired some one to do so. Appellant hired no one to drive the trucks, but exercised the authority to, and it did, require the owner of the truck to furnish some one capable of properly performing the work of hauling the material.

All the truckers used in this work were employed on approximately the same basis, and there was not any difference between the way in which Henson and the other truckers worked. Appellant did not enter into any written contract with any of the truckers, and none of them were employed for any specific length of time.

At a former trial of this case Henson, who died before the last trial, had testified, and by agreement his testimony at the former trial was introduced in evidence. He testified that at the time of the collision in question he was engaged in the trucking business for himself; that he owned the truck he used in such business; that he had been running the truck since April, 1925, and used it in the general hauling business, hauling for anybody he could get a job with; that he had a job of hauling with Smith Bros., Inc., Scott Shambaugh, H. Holcomb, A. M. Arnold, and Gulf Bitulithic Company; that at the time he was hauling for Smith Bros. he hauled for anybody that had hauling to do; that at the time of the collision in question he was hauling for Smith Bros.; that he had hauled a load and was empty at the time of the collision; that he had been hauling for Smith Bros. about one week before the collision occurred; that he made his contract of hauling for Smith Bros. with Mr. Dean, the plant superintendent; that the agreement was that

he was to haul material to Bellaire boulevard for 95 cents a load; that Smith Bros. owned no part of his truck, not a nut in it; that in doing the hauling he alone determined the route he would travel, and he alone determined the number of loads he would haul; that he furnished all of the gasoline and lubricating oil for his truck and paid for all repairs made on the truck; that after he got hurt in the collision he hired Louis Roan to drive his truck for him; and that he himself paid such driver.

T. B. Bristow testified that he was employed by appellant, Smith Bros., Inc., at the time G. E. Henson was employed; that appellant owned the bed on his truck; that at the time of the collision eighteen or twenty trucks were hauling for appellant; that Bill Dean, plant foreman for appellant, was the man who sent the trucks out; that Mr. Dean hired the truck drivers; that the truckers were paid on two bases, and, in answer to the question as to what were the two bases, he said, "I can answer for myself, I was paid by the load and by the hour"; that he had been employed both ways; other truck drivers were hired on the same bases; that Mr. Dean fired some truck drivers, he kicked them off, he just told them he could not use them any longer; that none of the trucks were hired for any specific time; that truckers were hauling for appellant mixed cement, asphalt, sand, and gravel, each trucker being directed what class of material to haul, that is, most of them were so directed; that he had not noticed that Henson was treated in a different way from anybody else; that all of the truckers in loading did so as directed; the material was poured out of a hopper onto the trucks, the placing of the material in the hopper was done by employees of appellant other than the truckers; that after loading each trucker would be given a slip showing where the load should be taken to and the trucker would haul the load to the designated place; that witness had hauled to different contractors that were building houses when told to do so by the ticket handed to him; that, when he took the load to the place designated by the ticket, appellant's agent at that place would sign the ticket and he would return it as required by appellant; it was returned to Mr. Dean or some of appellant's employees who ran the cement mixer, sometimes a white man and sometimes a negro; that he had no instructions as to the method of traveling, nor as to the rate of speed, but it was understood that, if he let the mixed cement stick, he would have to pay for the load; that he had some loads stick on him; that, if he had a flat tire, or something or other, or if he killed time, the mixed material stuck on him and he did not call appellant about it, he had to pay for it; that appellant worked only one street at a time; that Mr. John Parker was foreman of

the gang for appellant; appellant's construction gang directed the truckers where to dump the loads, and they were dumped at the place designated, and the truckers would return for another load; that Mr. Dean told him when he wanted him to work by the hour instead of by the load; that he would tell him to go out to a certain job and work by the hour, he would tell him when to haul hot stuff and when to haul sand or gravel; that the same method was used with most of the truckers, so far as he knew; that, when the trucks were needed, Mr. Dean would call the owner of the truck over the phone and tell him to show up, and then such owner would have to rush; that Mr. Parker, foreman of the construction gang, when the plant was to be shut down, notified them and thereafter no hauling was done; that the truckers were not employed for any number of days, nor was there any contract that the trucks were to be used all of any day or how many loads should be hauled; that he could not recall just the time Henson worked for appellant, that is, on what days he worked; that all the trucks were numbered, and on those which used one of appellant's bodies was placed a sign, "Smith Brothers," but he did not think Henson's truck had any sign on it; that the purpose for numbering the trucks was to identify them one from the other.

On cross-examination the witness Bristow testified that he owned his own trucks, three in number; that one of them was broken up by one of his negro drivers whom he had hired; that he himself paid such hired men; that he consulted no one about hiring the drivers or as to what he should pay them; that Smith Bros. had nothing to do with the hiring of his drivers; that Smith Bros. agreed to pay the truckers so much a load, but the truckers determined who should drive their trucks and what their pay should be; that Mr. Dean determined how many loads the trucks should haul; that, if a truck came to the plant in the morning and there was but one load to haul, the first trucker would get the load; that the owners of the trucks were paid by the load and all Smith Bros. was to do was to tell you where to get the material and where to take it and give you a ticket showing where to take it; that the trucker would choose the route he would travel in going out with the load and returning to the plant, and that Smith Bros. was not consulted about the route to be traveled; that he (the witness) purchased the gasoline, etc., to be used in running his truck, and that he alone determined the speed he would travel; that Mr. Dean would tell the truckers what time Smith Bros. would begin work on the following day, and that at that time the place would be open for the truckers to begin hauling.

On redirect examination the witness said that as long as hot stuff and concrete were being poured the trucker was supposed to haul until such stuff and concrete was all hauled, and, if they did not do so, they might be thrown off the job; that Mr. Dean hired just such trucks as he wanted and refused to hire such as he did not want.

On recross-examination, he said he did not know what the agreement made between Mr. Dean and Henson was; that so far as he knew such agreement might have been a special one between such parties; that he did not ask Mr. Dean where he should get his gasoline, lubricating oil, etc., for his truck, or to what shop he should take his truck for repairs, because it was none of Dean's business; that he did not ask Dean how much he could pay his (the witness') drivers, because it was none of Dean's business; that Mr. Dean would look the truck over, and, if the trucker had a driver that was capable of driving a truck and of doing the hauling, he was left alone, but, if he did not, he was kicked off the job, that is, if a man was put on a truck who could not drive the truck, he was told to get off the job; that they told him (witness) that they could not use his truck with the man he had in charge of it, and that he got another driver and the truck was put back on the job.

John Parker, foreman of the construction gang who spread the material when delivered by a truck, testified that he knew that Smith Bros. hired truckers and paid by the load according to zone; that in running concrete Mr. Dean was in charge at the plant; he told the drivers where to take it; when the load reached its destination, the trucker was told by one of the construction gang where to dump it; a check on the number of loads hauled by each truck was made at the plant by giving the driver a ticket, a duplicate being kept; Mr. Dean employed the truckers; the agreements were practically the same with all the truckers; the basis of pay for the load was figured by what would be a reasonable sum to be paid for a load; if the driver did not drive according to the way they wanted him to, they dismissed him.

W. N. Dean, foreman at the plant, testified that the haulers were paid by the load; the truckers furnished the trucks and their drivers and all things necessary to run the trucks; all the truckers were paid on the same basis; if the trucker's equipment did not meet Dean's approval, or if the driver was unsatisfactory, Dean would not let him work; he did not have agreements with truckers for any specific length of time that they should work, but just as long as they were satisfactory to him, and if they were not satisfactory to him either in equipment or efficiency, he would order that the truck be taken off the job; Smith Bros. had men on the job out on the street waiting for the material to come, and it was important to keep those men supplied; he told the truckers of

any change from the usual starting time and that for them to be there at the time stated, and told them if they were not there at such time he would replace them by some one else; the trucking was under his supervision; the rate of pay was by the load and based on certain zones; if a trucker came to work, he was expected to continue to work as long as the job was running; he determined the kind of material to be hauled; in fixing the pay per zone, it was based on the trucker earning $1.25 per hour, including his truck; he replaced the truck that was unsatisfactory; when he put a truck on, it was agreed between himself and the truck owner that he could put the truck on the job and he would be paid so much for each load hauled by his truck; he did not reserve the right to employ the drivers and Smith Bros. never employed the drivers used by the truck owners, but, if the driver was not a capable driver, and therefore unsatisfactory, he told the owner of the truck, who removed him; he did tell them the method used in handling loading tickets; that, while the truckers were paid on a load basis, some of them were sometimes employed to do special jobs; when the various drivers would be hired by the owners of the trucks and he would permit extra trucks to be put on, he would expect and it would be understood that these drivers were going to be subject to the method of hauling just like the owner of the truck himself, and that is the way he actually handled it; if the man was unsatisfactory, generally they would call the owner and tell him to replace the driver of the truck one, and, if it was the owner, Smith Bros. would replace the truck; if it was one of these hired drivers, then Dean just pulled him out of the line and the owner had to get somebody else, and that would have been done if necessary. Dean thought he had the power to do so, though he did not remember any particular instance, and that when a man went to work he expected him to get as many loads as he could. Dean had men waiting for him to carry the material, and he did not expect the driver to leave the job without his permission and consent, although they sometimes did so. If a man did that very often without his permission, Dean would not have him on the job.

D. C. Young, office manager, auditor, and accountant, and secretary-treasurer for Smith Bros., testified that he issued the pay checks to the truck owners; that they were paid by the load hauled; that he carried the pay roll of the truckers in the name of the truck owner; such pay roll was called "Truck Pay Roll"; it was carried by the truck number, thus indicating whose truck bore a particular number; on the pay roll everybody was carried by number as a pay roll designation; when a trucker put a truck on, he got a number, that is, name and number on it, and instead of using the owner's name the number was used on the pay roll; each truck carried a different number; each of the regular employees bore a number on the pay roll; this pay roll was called simply "Pay Roll," and the other the "truck sheet"; Smith Bros. had an entirely different set of men that worked by the hour from those who did the hauling by the load; Smith Bros. hired the truckers to haul by the load only; that, if a driver did not deliver the stuff in accordance with the way the trucker agreed to deliver it, of course he would be laid off; we would have the truck owner put him off, but, if he was the owner of the truck, we would lay him off ourselves; that is, some driver was violating some rule or was interfering with the job, with the progress of the work, if he was not a truck owner, we went to the truck owner about the matter, and it was left up to such owner to replace such driver, or to take the truck off the job.

We have taken the facts, and the testimony of the witnesses named, relative and pertinent to the question as to whether G. E. Henson was or was not an independent contractor, from a statement of facts in question and answer form, covering 293 pages.

The majority of this court holds that it is not shown conclusively and as a matter of law by the facts stated that G. E. Henson was an independent contractor, or that he was not such independent contractor, and so holding they find that the trial court did not err in refusing to instruct a verdict for defendant as requested by the defendant, and so holding they overrule appellant's first contention.

Appellant, Smith Bros., Inc., requested the court to submit to the jury the following special issue.

"Do you find from a preponderance of the evidence that G. E. Henson, under his employment with Smith Bros., Inc., in hauling paving material, was not an independent contractor, as that term is hereinafter defined to you?

"Answer 'Yes' or 'No,' as you find the facts to be.

"In connection with this special issue you are charged that by the term 'independent contractor' is meant any person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons using his own means and methods without submitting himself to their control in respect to all of its details."

The court refused to submit such requested issue or to submit such issue in any manner.

We are of opinion that the evidence, as a whole, and especially the testimony of G. E. Henson, was at least sufficient to entitle appellant to a submission of the issue

requested. Wherefore the court erred in refusing to submit the requested issue. Because of such error, if for no other reason, it becomes our duty to reverse the judgment rendered and to remand the cause, and it is accordingly so ordered.

There are other supposable errors assigned for the reversal of the judgment, but, as we are reversing the judgment and remanding the cause for another trial for the reason above stated, and as the supposed errors will not likely occur upon another trial, we will not incumber this opinion with a discussion of such other assigned errors.

### Dissenting Opinion.

The writer respectfully dissents from the finding of the majority of this court, that the evidence does not conclusively and as a matter of law show that G. E. Henson was at the time of the collision which resulted in the injuries suffered by appellee, J. R. O'Bryan, an independent contractor. I think the evidence does conclusively and as a matter of law show that G. E. Henson was at the time mentioned an "independent contractor" as that term is generally understood and construed by our appellate courts. So believing, I think the trial court should have instructed a verdict for appellant upon its request therefor.

The employment of Henson by appellant is clearly shown by the testimony of Henson, and it is undisputed by any witness. All the testimony of Henson pertinent to the special agreement or contract between himself and appellant is substantially as above stated.

Viewing the entire evidence, it is inescapable that Henson, in the course of his employment with Smith Bros., Inc., furnished his own car, bore the expense incidental to the operation and upkeep of the same, employed his own men, and paid them out of his own funds, chose his own route in making deliveries, the speed at which he would drive the car, and, outside of Smith Bros., Inc., telling him where to receive the material to be hauled and where to deliver it, no control whatsoever was exercised over him in the performance of his duties.

It is made clear from all the testimony that appellant was looking to Henson only for final results of the work, that it was only interested in having the material delivered under the terms of the contract entered into between itself and Henson. To my mind, it is absurd to hold that the supervision exercised by appellant over the work in which it was vitally interested, the performance of which it had let to parties regularly engaged in the business of hauling by the load, furnishing their own trucks, equipment, etc., in so doing constituted Henson an employee of appellant. In my opinion, to hold that one who employs a person who is engaged in the special business of hauling by the load, or under any other special contract, is liable for damages which some third person may suffer by reason of the negligence of the owner of the truck or his driver, would indeed establish a dangerous precedent. I surmise that few, if any, responsible persons would employ truckers to haul for them if they understood that they would be held responsible for injuries inflicted upon third persons by reason of the negligence of the owners of the trucks, or of their drivers. Let us apply an illustration: Suppose A has a lot of furniture situated in Houston which he wishes to have removed to Galveston by trucks, and that upon such fact becoming known to those engaged in the business of hauling for others they present themselves to A and make an offer to haul his furniture from Houston and deliver it to a certain place designated by A in Galveston for $10 per load. A accepts such offer under condition that the trucker was to furnish a truck capable of properly hauling the furniture and a competent driver. Could it be reasonably held that A would be liable to persons injured by reason of the negligent driving of the trucks by either the owner or the driver of his truck employed by him? A true test of a contractor is that he renders service in the course of an independent occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished. The mere right of a person who has let out a contract to supervise the work in such a way as to see that it is performed according to contract does not make the one accepting the contract an employee of the person who let the contract. Security Union Ins. Co. v. McLeod (Tex. Com. App.) 36 S.W.(2d) 449, 451; Southern Surety Co. v. Shoemake (Tex. Com. App.) 24 S.W.(2d) 7; Planters' Cotton Oil Co. v. Woods (Tex. Civ. App.) 25 S.W.(2d) 188 (writ of error refused).

Security Union Insurance Company Case presents very similar facts to those in the present case. The evidence in that case disclosed that one J. L. Menefee, a hauling contractor, owning six trucks, was employed by Whitham & Co., paving contractors, to haul gravel from a point several miles from town to a place in the city where the gravel was needed. Menefee drove one of the trucks himself and employed drivers for the other trucks. All expenses necessary to the operation and upkeep of the trucks, including gas, oil, and repairs thereon, were borne by Menefee, and the drivers of the trucks employed by Menefee were paid by Menefee out of his own funds. The trucks were loaded from a crane owned and operated by Whitham & Co. As a truck was loaded and

after a signal to "pull out," the driver left the pit, delivered the load to its destination, where the load was dumped under the supervision of another employee of Whitham & Co. Menefee was paid on the basis of 75 cents per yard for the gravel he hauled, which was determined from slips given to the drivers of the trucks at the time the same were loaded. Menefee testified that he had told the drivers of his trucks that as long as they pleased Whitham & Co. they would have a job; if they did not please Whitham & Co., he (Menefee) would turn them off. In that case the court said:

"The mere right of a person who has let out a contract, to supervise the work in such a way as to see that it is performed according to contract, does not make the employees of the contractor his employees. Simonton v. Perry (Tex. Civ. App.) 62 S. W. 1090; Smith v. Humphreyville, 47 Tex. Civ. App. 140, 104 S. W. 495, writ of error refused; American Indemnity Co. v. Dinkins (Tex. Civ. App.) 211 S. W. 949, writ of error refused.

"While it may be true that Whitham & Company loaded the trucks and designated where they should be unloaded when they reached their destination, they had and exercised no other supervision and had nothing to do with the drivers' employment or the means by which the hauling was done; they were concerned only in seeing that the trucks were loaded, and in the gravel being delivered to them; then and as delivered, they paid Menefee for the hauling on the basis of 75 cents per square yard."

In 14 R. C. L. p. 71, § 8, it is said: "But the fact that the employer has some incidental powers over the laborers doing the actual manual work, such as the right to compel the contractor to discharge any workman who is incompetent or who commits some wrongful act or depredation, though generally a fact of some importance tending to show his subserviency, does not necessarily require the contractor to be considered a mere servant."

I think to hold that appellant is liable for the negligent act of Henson under the facts of this case would be a travesty upon justice. So believing, I respectfully enter my dissent from the holding of the majority, that the evidence does not show conclusively and as a matter of law that Henson was not an independent contractor.

However, the majority has ordered that the judgment be reversed and the cause remanded for the reasons pointed out, and it is therefore ordered that such judgment be and the same is reversed, and the cause remanded.

Reversed and remanded.