HENRY SCHROEDER ET AL. (DR. PEPPER BOTTLING CO. ET AL.) V. I. N. RAINBOLDT ET AL.

No. 6698. Decided November 12, 1936.
(97 S. W., 2d Series, 679.)

*E. C. Gaines,* of Austin, *McCormick, Bromberg, Leftwich & Carrington,* of Dallas, *George Clark* and *Joseph W. Hale,* both of Waco, for plaintiffs in error.

The charge of the court as given to the jury was reversible error. Humble Oil Co. v. McLain, 280 S. W., 587; Yellow Cab & Baggage Co. v. Smith, 30 S. W. (2d) 697; Hilliard v. Murdock, 20 S. W. (2d) 1070.

*Bryan & Maxwell,* of Waco, for defendants in error.

On the liability on the the Dr. Pepper Company. Wallace

v. Southern Cotton Oil Co., 40 S. W., 399; Prince v. Taylor, 171 S. W., 826.

On the charge of the court. Holt v. Farmer (Com. App.), 56 S. W. (2d) 633; Hubb-Diggs Co. v. Bell, 1 S. W. (2d) 575.

MR. JUDGE TAYLOR delivered the opinion of the Commission of Appeals, Section B.

This is a suit by I. N. Rainboldt, individually and as next friend, to recover damages for personal injuries sustained by his six-year-old daughter Wanda. The suit is against Dr. Pepper Bottling Company, Henry Schroeder and F. A. Graham. Upon the first trial judgment was for plaintiff but was reversed by the Court of Civil Appeals. 40 S. W. (2d) 827. Judgment upon the present trial was for plaintiff upon jury findings against all defendants and was affirmed by the Court of Civil Appeals. 66 S. W. (2d) 497. Two applications for writs of error were filed, one by the company and the other by Schroeder and Graham. Both were granted.

At the time of the accident Wanda was crossing diagonally North Fifth Street in the City of Waco near the middle of the block and was struck and run over by a truck owned by Schroeder and driven by Graham, his helper. They are alleged by Rainboldt to have been acting for themselves "and as servants, agents and employes of the defendant company in the sale and distribution of * * * the drink commonly known as Dr. Pepper"; also that the truck operated by Schroeder and Graham was under the control of the company, and that the company directed the places to which it should be taken, the things with which it should be loaded, and exercised control in other particulars. Schroeder was accompanying Graham and was seated beside him in the truck when the accident occurred. The truck carried Dr. Pepper signs on the body as did the trucks used by all of the company's salesmen. The negligence charged by Rainboldt was the failure of Graham to sound his horn, failure to promptly apply his brakes, and discovered peril.

The defenses interposed in addition to a general denial were contributory negligence on the part of Wanda resulting from her own acts, and on the part of the parents and imputed to her, and that of "sudden emergency" in that if Graham failed to use his brakes promptly or sound a warning it was because the act of Wanda in attempting to run across the street in the manner alleged created such an emergency as to render a reasonably prudent driver incapable of deliberate action. It was specially pleaded by the company that Schroeder was an

independent contractor, Graham was his employee, and that the company was not liable for their acts. The defendants pleaded also that the collision was due solely to an unavoidable accident.

The jury found that Schroeder was not an independent contractor, but was an agent and employee of the company, and that he was in charge of the truck which was being operated for the joint use of Schroeder and the company; also that Graham was working with him in its operation with the company's knowledge and consent and that his failure to sound his horn and apply the brakes were proximate causes of the injuries. The findings were in favor of plaintiff on the issues of discovered peril and sudden emergency; also on the issues of contributory negligence. The jury found that Wanda attempted to run across the street diagonally where there was no street intersection but that her conduct in so doing did not constitute negligence or create a "sudden emergency" as defined by the court and was not the sole proximate cause of the collision. It was found also that she failed to keep a proper lookout for approaching automobiles while proceeding across the street, but that her failure to do so was not negligence.

There was evidence to support the findings on the material issues submitted, including the issues relating to actionable negligence on the part of Graham and discovered peril. He himself testified that when he was about thirty feet from the place where he struck Wanda "she was just leaving the sidewalk on the opposite side of the street" and was "running toward the truck" at an angle of about sixty degrees; that she had her raincoat pulled up at the side of her head and that he failed to sound his horn. The jury found that his failure to do this and his failure to apply his brakes as she entered the street were acts of negligence proximately causing the accident.

The jury found that Schroeder was both an employee and agent of the company and in charge of the truck; that the driver was working with him in its operation with the knowledge and consent of the company and that its operation was for the joint use and benefit of Schroeder and the company; also that Schroeder was not an independent contractor.

While the assignments of error are numerous, it is necessary to discuss only those relating to the question of independent contractor and the manner in which the case was submitted to the jury. Anticipating a reversal of the case on account of error later to be pointed out, the testimony bearing upon the question of the relationship of the company and Schroeder will

be reviewed with a view to ascertaining if it will be necessary upon another trial to submit to the jury the special issues and definitions involving this question.

Miller testified that he was sales manager and in that capacity looked after the business of the salesmen; that the company operated ten trucks out of its plant and that he looked after the checking of the trucks to ascertain what they had on and how much; that he did this "the first thing of a morning when those drivers are loading out"; that the company permitted its salesmen to have helpers and Schroeder's son-in-law, Graham, usually went with him in that capacity and had been doing so for a year or more; that the company designated the towns for the different drivers to make and no driver was privilege to get on any other route; that Schroeder had been working for the company about seven years when the collision occurred, and was paid a commission for selling Dr. Pepper at the rate of fifteen cents per case; that "when he takes a case out and sells it be gets seven and a half cents and when he brings an empty in he gets seven and a half cents." Miller's testimony in question and answer form in part reads:

"Q: You use this system of trucks and truck drivers as your salesmen for your products, is that right?

A: They sold the Dr. Pepper, yes sir.

Q: And that was the main purpose for which you had them there, wasn't it, to sell Dr. Pepper products?

A: That is why he asked for the route, yes sir.

Q: Yes, and you call them salesmen and truck drivers indiscriminately, don't you?

A: Yes sir.

Q: And as Mr. Schroeder was out on his route, his primary purpose, so far as your interest was concerned, was the selling of Dr. Pepper merchandise?

A: Yes sir.

Q: Who down there at the plant exercises supervision and control over the drivers?

A: I do.

Q: You have a right, as manager there, or who had the right down there to hire and fire drivers?

A: I do.

Q: That is true with reference to Schroeder or anybody else?

A: Just so they are drivers.

Q: Now, with reference to whether or not, Mr. Miller, you

would have the right to discharge Mr. Schroeder in case he was not satisfactory, what are the facts?

A: I could and would."

He further testified he had seen Graham drive Schroeder's truck; that the company had Schroeder's truck painted for him and paid for it.

As to the character of service required by the company of its salesmen Miller testified:

"Q: And the truck drivers and salesmen were expected to diligently serve their routes, were they not?

A: Yes sir.

Q: You required of them that they do not neglect any of the towns on their routes, did you not?

A: Yes sir.

Q: You knew as sales manager about how much merchandise should be sold in each of those towns on a man's route, didn't you?

A: Just about, yes sir.

Q: And you expected and required those salesmen to sell approximately that much merchandise in each town, didn't you?

A: I was expecting them to get results, yes sir.

Q: That merchandise was sold by these men on a price fixed by the company, wasn't it?

A: Yes sir.

Q: You had a right at any time to discharge any one of these salesmen and truck drivers for unsatisfactory services, didn't you?

A: The salesmen or truck drivers, not the helpers."

Mr. Buchannan, the bookkeeper, testified that Schroeder's route was No. 7 which covered "in the direction of" Mart, Valley Mills and Crawford; that a sheet showing the charge sales to the customers was turned over to him (Buchannan) and that he made a charge to the customer and later sent him a bill for it; that he turned those bills over to Schroeder to collect when he went out on his route and that when Schroeder reported the collection it was credited to the customer's account; further, that the company had Schroeder's truck painted and had the signs of the company put on it for advertising purposes; that when the drivers came back in the afternoon they were credited with the cash and merchandise, which two accounts were supposed to balance each day.

Schroeder testified that he had been working for the company about seven years and had been running a truck for it all

of that time; that at the time of the accident he was returning from a trip on his route.

"Q: Were you working for the company that day?

A: Yes sir.

Q: Where had you been?

A: I went out on this Valley Mills highway * * *.

Q: On business for the company?

A: Hauling soda water, yes sir.

Q: You used the truck exclusively for the use and benefit of the business that you got from the Dr. Pepper Manufacturing Company?

A: Yes sir. Well, we used it for anything else, if we had time to haul anything else * * *."

While the foregoing testimony is amplified in some particulars as brought out by the defendants, it is not contradicted. Miller testified that the company had nothing to do with the employment of Schroeder's helper and did not attempt to direct him (Schroeder) in the performance of his work; that Schroeder bought his own truck and paid the expenses of its operation; that the company never attempted to control the physical details of its operation; that it painted all of the trucks for the privilege of putting its sign on them for advertising purposes, making this requirement as a part of its arrangement with its salesmen. He testified the salesmen had no certain hours, but "We just all meet there at about a certain time every morning and everybody loads out and gets his route * * *"; further that no directions were given as to what highway to use in calling on the towns; that they made their own customers, and worked their own routes and that he hired and paid his own helper; that when he found a credit customer if the company did not accept credit then he could go ahead and sell the customer anyway but would be responsible for the customer's bill; that under the contract with the company, which was oral, he made the towns as he wanted to; in other words, "all we drivers would do was to keep them supplied and try to sell them all, and *to keep them from phoning in for stuff * * *.*" (Italics ours.)

■ Under the foregoing facts Schroeder was correctly held liable to plaintiff under the doctrine of respondeat superior. Spears Dairy v. Bohrer, 54 S. W. (2d) 872; Ochoa v. Winerich, 127 Texas, 542, 94 S. W. (2d) 416; King v. Galloway (Com. App.), 284 S. W., 942; Maryland Casualty Co. v. Kent (Com. App.), 3 S. W. (2d) 414; Texas Power & Light Co. v. Denson,

125 Texas, 383, 81 S. W. (2d) 36; Id. (Civ. App.), 45 S. W. (2d) 1001; Western Indemnity Co. v. Prater (writ ref.), 213 S. W., 355; Buick Automobile Co. v. Weaver (writ ref.), 163 S. W., 594; Woodward-Wanger Co. v. Nelson et al., 11 S. W. (2d) 371; Patton-Worsham Drug Co. v. Drennon, 123 S. W., 705.

■ Nor was it necessary for the court to submit to the jury the issues and definitions touching the relationship of the company and Schroeder. Spears Dairy v. Bohrer, supra. The case cited is similar in point of fact in all essential particulars. The Court of Civil Appeals held that as a matter of law the driver of the truck was not an independent contractor under his arrangement with the dairy as its salesman. While the driver used his employer's truck instead of his own this circumstance is immaterial in its bearing upon the vital question of control. The method of carrying on the employer's business in that case, as in this, contemplated the use of trucks by the salesmen. The Court of Civil Appeals says:

"On the facts stated Mr. Tolle represented the will of the appellant, not only as to the result of the work, that is the selling of the milk, but also as to the manner by which the milk was sold."

It was not Schroeder's property he was selling. He used his own truck because of the company's requirement that its salesmen be thus equipped. The company knew about how much Dr. Pepper should be sold in each town on the salesman's route and required him to sell approximately that much. If his service in salesmanship and in keeping his customers supplied with promptness was not satisfactory it had the right to discharge him without liability for breach of contract. In such event in the language of Miller, "I could and would" have discharged him. That Schroeder was cognizant of the company's right of control and his lack of independence in its service appears from his statement that he tried to keep them from phoning in for stuff, and that he used his truck for something else *if he had time to haul anything else.* He knew his services, if allowed to fall below the standard indicated, were subject to arbitrary termination.

The facts do not bring the case within the controlling principle in Smith Bros. v. O'Bryan (Civ. App.), 62 S. W. (2d) 505, (Com. App.), 94 S. W. (2d) 145. There the owner of the truck worked for whom he would and when he pleased, with impunity. He was engaged in a "special employment" such as

was involved in Lehr Inc. v. Brown, 127 Texas, 236, 91 S. W. (2d) 693, and Southern Surety Co. v. Shoemake (Com. App.), 24 S. W. (2d) 7, and was independent in his method of operation. In those cases, and also the case of National Cash Register Co. v. Rider (Com. App.), 24 S. W. (2d) 28, the "elements of control" were such that the drivers were held not to be employees. In the case last cited the driver is quoted by the court as saying:

"The National Cash Register Company has nothing to do with where I go and when * * *. That company had nothing to do with, or any interest in, how I get about over the country."

Summarizing the testimony the court says:

"In other words, the testimony on this subject conclusively shows that the National Cash Register Company did not have the right to control the details of the work done by Weeks for its benefit, nor in fact did it have the right of control of Weeks *in any essential part of the work which Weeks was doing for its benefit.*" (Italics ours.)

In stating the controlling principle the court further says:

"In every case which turns upon the nature of the relationship between the employer and the person employed, the essential question to be determined is whether the employer had the right to exercise control over the details of the work."

In King v. Galloway (Com. App.), 284 S. W., 942, cited in support of this principle the court says:

"The Court of Civil Appeals says Galloway did not tell the driver he must travel on certain roads in Dallas before reaching the grain company's plant. We do not think that was material in this case. Large stores and factories rarely control the routes of their delivery wagons except in such a way as to accommodate the best interests of their customers. If there were several routes Tillery could have taken with equal benefit to his employer, it was immaterial which he employed."

Nor do the facts bring the case within the governing principle in American National Insurance Co. v. Denke, 128 Texas, 229, 95 S. W. (2d) 370, which involves a different type of employment. The decision in that case was predicated upon the fact that the relationship between the insurance company and Saunders, the driver of the car, was "undoubtedly one of agency" purely, such as usually exists when a principal engages the services of a broker, a factor, a rental agent, or attorney, and is concerned solely with the result of the work of the agent. As is pointed out in the opinion Saunders had no car and was not required to use one in discharge of his duties. The

facts are readily distinguishable from the facts of this case in that use of an automobile by Saunders constituted no part of his contract of service in terms or by implication.

In the recent case of Ochoa v. Winerich Motor Sales Co., 127 Texas, 542, 94 S. W. (2d) 416, it is pointed out that in determining the quality of the employment no absolute test can be prescribed, and that "The modern cases look to the broader question whether the person is in fact independent or subject to the control of him for whom the work is done."

The testimony of the company's sales manager and Schroeder himself is such that reasonable minds cannot differ as to whether Schroeder was independent in his operations with respect to the vital matters touching his employment; or stated in another way, whether he was subject to the control of the company with respect to the material details of selling and delivering its products. It will be unnecessary upon another trial for the court to submit special issues to the jury to determine the relationship of the company and Schroeder. It is unnecessary also to consider the assignments presented by plaintiffs in error calling in question the manner of submission or the correctness of the issues and definitions used by the trial court in that connection.

■ Special issue No. 1 submitted the question of unavoidable accident. It was followed by numerous other issues. The court instructed the jury in connection with the first issue that if it answered that the collision was an unavoidable accident it need not answer any of the other issues, but if it answered that it was not an unavoidable accident then it should answer the succeeding issues. This constitute reversible error. Grasso v. Cannon Ball Motor Freight Lines, 125 Texas, 154, 81 S. W. (2d) 482; Id. 59 S. W. (2d) 337; McFaddin et al. v. Hebert et al., 118 Texas, 314, 15 S. W. (2d) 213. The manner of submission was tantamount to telling the jury that it must answer as instructed in the second alternative in order for Rainboldt to recover, and that if it answered as instructed in the first alternative damages were not recoverable. In the Grasso case, supra, the court says:

"Counsel for Grasso contend that it is the law of this state that it is not reversible error to instruct a jury to the effect that affirmative or negative answers to certain questions will relieve them of the duty of answering certain other questions. We agree to this contention in some instances. In spite of this, it is certainly not proper for the court to tell the jury the ulti-

mate result of all of their answers in submitting a case on special issues. In our opinion, the instruction preliminary to question No. 15, supra, in effect did exactly that. It will be noted that the instruction directed the jury that if they convicted the defendant of negligence and acquitted the plaintiff of contributory negligence, to find the amount of the plaintiff's damages, otherwise not. Such an instruction clearly told the jury that they must find the defendant guilty of negligence, and the plaintiffs not guilty of contributory negligence, in order for the plaintiff to recover. Such a charge is undoubtedly in violation of our special issue statutes."

It is not always reversible error to instruct a jury in the charge to answer or not answer a certain issue conditioned upon the answer to another, but in this instance the instruction was in connection with an answer to an issue that determined the case if in accordance with the second alternative. For this reason the instruction constituted reversible error.

Complaint is made of the argument of counsel for Rainboldt, some of which was improper. It is not necessary to discuss it as it need not recur upon another trial.

We approve the holding of the Court of Civil Appeals upon the question of the company's liability for the acts of Schroeder's helper, Graham; also upon the questions of discovered peril, contributory negligence and sudden emergency. We find no other reversible error in the case.

The judgments of the trial court and Court of Civil Appeals are reversed and the cause is remanded.

Opinion adopted by the Supreme Court November 12, 1936.