## Williams v. National Cash Register Company.

(Decided March 13, 1914.)

Appeal from Kenton Circuit Court
(Common Law and Equity Division).

1. Master and Servant—Independent Contractor.—An independent contractor is one who, carrying on an independent business, con-

tracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work.

2. Master and Servant—Test of Relationship.—The test of the relationship of master and servant is the right to control; it is not the fact of actual interference with the control, but the right to interfere that makes the difference between an independent contractor and a servant or agent.

3. Master and Servant—Independent Contractor.—If the employe is merely subject to the control or direction of the owner or his agent as to the result to be obtained, he is an independent contractor; but if the employe is subject to the control of the employer as to the means, he is not an independent contractor.

4. Contracts—Rule Excluding Parol Evidence to Vary Written Instrument.—The rule excluding parol evidence to vary or contradict a written instrument applies only in controversies between the parties to the instrument and those claiming under them; it has no application in controversies between a party to the instrument and a stranger to it.

ROBERT C. SIMMONS for appellant.

STEPHENS L. BLAKELY, GEO. E. PHILLIPS, C. D. BRONSON and JOHN H. KLETTE for appellee.

Opinion of the Court by Judge Miller—Reversing.

While the appellant, Mrs. Pearl B. Williams, was riding in a buggy on the streets of Covington, on June 10, 1911, she was thrown from her buggy and severely injured in a collision with an automobile. The automobile was owned by Bert. Alexander, a sales agent of the National Cash Register Co., in Cincinnati, having as his territory several adjoining counties in Ohio, and Kenton and Campbell counties, in Kentucky.

Alexander's office was in Cincinnati. The machine was driven by Todd Meadows, a chauffeur in the employment of Alexander.

Mrs. Williams brought this action for damages against Meadows and the National Cash Register Co., and recovered a judgment for $7,000.00 against Meadows; but, at the conclusion of all the evidence, the trial court, holding there was no testimony connecting the National Cash Register Co., with the accident, or making it responsible for the injury, directed the jury to return a verdict for the company, which was done. Mrs. Williams appeals, insisting that Meadows was in the service of the National Cash Register Co., at the time

of the collision; the defendant insisting he was the servant of Alexander, under a separate or independent employment.

The principal question, therefore, for decision, is this: Did the relation of master and servant exist between Meadows, the chauffeur, and the National Cash Register Co.?

The automobile was the property of Alexander, and Meadows was his chauffeur, employed by Alexander, and paid by him. Alexander, as before stated, was the sales agent of the appellee, working on a commission basis, by which he received a certain commission for all sales negotiated by him or his employes, he paying all of his expenses in maintaining his office and his agency, under a written contract with the company.

Alexander repaired cash registers in the territory of his business; and in doing so, according to the testimony for appellee, he bought repair parts from the company; made charges for repairs independently of his business for the company; collected all the moneys for repairs, and made no report thereof to the company.

At the time the accident occurred, Meadows and McLaren, also in the employment of Alexander, were delivering a cash register to Shotwell, in Latonia. Meadows says the register had been repaired by Alexander at a cost of $8.50, and that this repair bill was collected by Meadows when he delivered the register to Shotwell on the day of the accident. Shotwell, however, does not agree with Meadows about the repairs, but says the only time the cash register in question was delivered to him, was the occasion of its delivery under the original purchase. In this, however, he is probably mistaken, since Shotwell's original order, dated April 15, 1910, about 14 months before the accident, is produced by the company, and Shotwell's receipts for payments under that order are produced by him. Shotwell does not remember ever having had any repairs made upon his register; but Meadows is corroborated by McLaren, who was present at the time of the delivery and the payment of the bill, and by Shepard, Alexander's book-keeper, who proves the credit.

As there is a decided difference between opposing council as to the contract relations between Alexander and the company, a consideration of the terms of the contract between them becomes necessary to determine whether the relation of master and servant existed be-

tween the National Cash Register Co., on the one side, and Alexander and his employes on the other. The case would not be different in so far as it relates to the liability of the National Cash Register Co., if Alexander himself had been driving his automobile instead of his employe, Meadows, since in either case the question is this: Was the register being delivered by Alexander for the National Cash Register Co., or for himself alone? If the company had the right to say not only what should be done by Alexander in the conduct of his business for the company, but how he should do it, the relation of master and servant existed.

The contract is in the form of forty-one written propositions directed to Alexander by the National Cash Register Co., and accepted by him, by which the company appointed Alexander as its sales agent for the sale of its cash registers in the territory above indicated.

The provisions of the contract which are material to this discussion, are as follows:

"1. You agree to devote your whole time and best endeavor to the business of the company in said territory, under the direction of its officers or their representatives, and to conform with the rules and regulations of the company now in force, and which may be hereafter adopted and mailed to your address. You also agree to employ such salesmen to assist you, and upon such terms and conditions as the company may require.

"6. It is mutually understood and agreed that the company shall have the right, at all times and under any circumstances, to adjust the commission on any sale that may be in dispute between you and any other sales agent of the company—that is, where question may arise as to which sales agent is entitled to said commission—and the company's decision shall be final.

"13. You agree that you will not, under any circumstances give any part of your commission to any assistant, local agent, or other person as an inducement for him to assist you in making a sale, without permission of the company.

"14. All orders for cash registers shall be taken upon the printed forms furnished by the company, which are to be returned to the company immediately after the signature by the purchasers, and all conditions and special arrangements shall be noted thereon, it being understood and agreed that the company shall in no way be responsible for promises or conditions not specified on

the orders. No registers or supplies are to be sold for more or less than the list price established by the company, plus freight or express. If the company is obliged to make .any concessions to customers, or any expense is incurred by a violation of these requirements, the amount thereof may be charged to your account if the company so elects.

"16. You agree that you will not purchase or deal in second-hand registers on your own account during the continuance of this contract.

"17. You agree to see that the necessary repairs on registers sold by the company or its agents in your territory, that can be made by you, through your agency, are promptly and properly made, in such manner as the company may direct, and to co-operate with and aid the company making all other repairs in your territory.

"18. The company to send bills direct to purchaser who are to pay them direct. But when the company is to collect any note or account through the usual course, and it becomes necessary to place the same in your hands for collection, you are to collect promptly and remit at once all amounts collected, whether the sale was made by you or not.

"19. You agree to make daily remittances to the company of all cash received by you for the company, including money received for repair parts or supplies sold, or by way of a compromise when a register is taken back, in the manner prescribed by its treasurer; and in no event shall you use any sum of money collected for the company to defray the expenses of your agents, or for any other purpose, or deposit the same in any bank to your credit. All checks made payable to the company are to be forwarded directly to it the same day they are received and if by inadvertence a check for an amount owing to the company is made payable to you, you will endorse and forward it to the company the same day it is received. If a payment be made to you in currency you will buy a draft, money or express order. The company reserves the right to refuse your personal check in payment of any amount due it. In no case and under no circumstances will you sign the company's name; but, should a purchaser require a receipt for a cash or other payment, you will receipt to him in your own name as sales agent, and if desired, the company will forward an official receipt directed to the purchaser for all amounts which may be credited to his account.

"21. You are to pay your own expenses; the company to pay none of your traveling, office or other expenses, for which you expressly agree to contract in your own name, and under no circumstances are you to represent that the company is responsible for the same.

"22. All attorneys fees and costs arising upon collection of the prices of registers sold by you or recovering possession of same shall be divided between you and the company on the same percentage basis as the commission was originally credited. In case a cash register is shipped to a purchaser on an order procured by you, and the purchaser makes no payment on the same, you are to pay your proportional part of the express or freight charges on the register as above stated. You are to pay your own expenses in attending on trials of cases, whether you are responsible for the same or not, if the company so elects. No charge to be made against you for the services of the Legal Department of the company.

"23. You agree, while operating in your territory, outside of your headquarters town, to carry with you on the road the full line of regular samples required by the company, as specified in its books of decisions.

"27. You agree not to contract any indebtedness of any kind for material, fixtures, etc., without obtaining the consent of the company or its authorized representatives.

"29. The officers of the company or their authorized representatives shall have the privilege of examining all your books of accounts, vouchers and papers necessary to ascertain if the business of your agency is being carried on in a manner satisfactory to the company.

"35. You agree to employ no person to assist you in said agency except under written contract, by the terms of which the company shall be released from all liability for any indebtedness from you to such person. You shall send a duly executed copy of said agreement to the company immediately upon such employment. It is fully understood and agreed that you are not to employ any person whatever until you have supplied the company with full particulars respecting the applicant on the form furnished by the company, giving his name, record, previous occupation, etc., and should said applicant, for any reason, be objectionable to the company, he is not to be employed by you.

"36. You further agree that you will not compel any salesman employed by you to stand, directly or indirectly more than his pro-rata proportion of any reductions in commissions to you, necessitated by excess allowances, irregular orders, or resulting from other causes."

By the second section of the contract, Alexander binds himself not to engage, either directly or indirectly, in the business of selling cash registers within two years after the termination of the contract.

The third and fourth sections fix the commissions to be allowed Alexander and paid by the company, for sales; while, by the fifth section, the company reserves the right to fix Alexander's commissions on exchanges of new cash registers for old ones, or for registers of other makes, and a waiver of commissions by Alexander on sales made in his territory, under certain conditions.

By the fifteenth section no sale was to be binding upon the company until it had been accepted by the company, unless by other written instructions.

By the twenty-seventh clause Alexander agreed not to contract any indebtedness, of any kind, for materials, fixtures, &c., without obtaining the consent of the company, or its authorized representatives.

By the thirty-first section, Alexander was to keep all consignment registers placed with him by the company insured, and the policy therefor made payable to the company.

By the thirty-third section, Alexander bound himself to send to the company, at the end of each day, a list of all persons who were, during the day, called upon by Alexander or his employes; said list to show each person's name, street address, city and business; and, in brief, the object and result of said call, to be rendered on the form furnished by the company.

And, by the thirty-ninth section, the agency could be terminated at the option of either party.

Alexander's Cincinnati office bore the sign "N. C. R.," upon its windows or door, and the telephone directory carried the company's name at that office.

It will be seen from the contract above quoted, that the company practically reserved to itself the complete control over the details of the work of the agency even to an approval of the persons to be employed and paid by Alexander in the conduct of his agency.

In 26 Cyc., 1546, an independent contractor is thus defined:

"An independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work. Generally the circumstances which go to show one to be an independent contractor, while separately they may not be conclusive, are the independent nature of his business, the existence of a contract for the performance of a specified piece of work, the agreement to pay a fixed price for the work, the employment of assistants by the employee who are under his control, the furnishing by him of the necessary materials, and his right to control the work while it is in progress except as to results.

"The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere that makes the difference between an independent contractor and a servant or agent. To enlarge the test is whether the employee represents his employer as to the result of the work only or as to the means as well as the result. If the employee is merely subject to the control or direction of the owner or his agent as to the result to be obtained, he is an independent contractor. If the employee is subject to the control of the employer as to the means, he is not an independent contractor."

In the leading case of Singer Manufacturing Co. v. Rahn, 132 U. S., 518, the plaintiff recovered damages for personal injuries sustained by reason of the careless driving of Corbett, who was engaged in selling sewing machines on commission for the company. Corbett worked on a commission basis, the company furnishing a wagon, and he the horse and harness used in the business. Corbett agreed to "give his exclusive time and best energies to said business and to pay all the expenses attending the same;" to work under rules and regulations prescribed by the company; and should neither sign nor make use of the name of the company in any manner, whereby the public might be led to believe that the company was responsible for his actions, it being specifically provided that his power was simply to make sales and turn over the proceeds to the company. The company also reserved the right to terminate the contract at any

time upon giving ten days' notice, in writing. It was claimed that Corbett was an independent contractor; but in holding otherwise, the court said:

"The general rules that must govern this case are undisputed, and the only controversy is as to their application to the contract between the defendant company and Corbett, the driver, by whose negligence the plaintiff was injured.

"A master is liable to third persons injured by negligent acts done by his servant in the course of his employment, although the master did not authorize or know of the servant's act or neglect, or even if he disapproved or forbade it. Philadelphia & Reading Railroad v. Derby, 14 How., 468, 486. And the relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, not only what shall be done, but how it shall be done. Railroad Co. v. Hanning, 15 Wall., 649, 656.

"But what is more significant, Corbett 'agrees to give his exclusive time and best energies to said business,' and is to forfeit all his commissions under the contract if while it is in force he sells any machines other than those furnished to him by the company; and he further 'agrees to employ himself under the direction of the said Singer Manufacturing Company, and under such rules and instructions as it or its manager at Minneapolis shall prescribe.'

"In short, Corbett, for the commissions to be paid him, agrees to give his whole time and services to the business of the company; and the company reserves to itself the right of prescribing and regulating not only what business he shall do, but the manner in which he shall do it; and might, if it saw fit, instruct him what route to take, or even at what speed to drive.

"The provision of the contract, that Corbett shall not use the name of the company in any manner whereby the public or any individual may be led to believe that it is responsible for his action, does not and cannot affect its responsibility to third persons injured by his negligence in the course of his employment.

"The circuit court therefore rightly held that Corbett was the defendant's servant, for whose negligence in the course of his employment, the defendant was responsible to the plaintiff."

It will be seen that the Rahn case and the case at bar are strikingly alike in their controlling facts, and that the court placed stress upon the fact that Corbett's entire time, like Alexander's was given to the company's business.

The general doctrine as to what constitutes an independent contractor was thus stated in Messner v. Bell & Coggeshall Co., 133 Ky.,19:

"An 'independent contractor' is one who is independent of his employer in the doing of his work, and may work when and how he prefers. A 'servant' is one who is employed by another and is subject to the control of his employer. In 1 Thompson on Negligence, Secs. 579 and 629, the rule is thus stated: 'The right to control the conduct of another implies the power to discharge him from the service or employment for disobedience; and, accordingly, the power to discharge has been regarded as the test by which to determine whether the relation of master and servant exists.' 1 Thompson on Negligence, Sec. 579, 'In determining whether the relation is that of master and servant or that of proprietor and independent contractor, the courts have sometimes taken into consideration the manner of payment: whether payment was to be made by the day, week, month, etc., with a reservation of the power to discharge, or whether there was to be a payment by the piece or by the entire job. But the mode of payment is not a decisive test by which to determine this question. The test lies in the question whether the contract reserves to the proprietor the power of control over the employe.' "

See also Paducah Box Co. v. Parker, 143 Ky., 609; Adams Express Co. v. Scofield, 111 Ky., 832.

Appellee relies, however, upon Jahn's Admr. v. W. H. McKnight Co., 117 Ky., 655; Ballard & Ballard Co. v. Lee's Admr., 131 Ky., 414; L. & N. R. R. Co. v. Smith's Admr., 134 Ky., 47; Bellamy v. F. A. Ames Co., 140 Ky., 98, and other cases.

A careful examination of those cases, however, will show that they are not controlling under the facts of this case.

In the Scofield case *supra,* it was held that the employee of the agent of an express company who carried parcels from the office of the company to the railroad depot, was the servant of the company and not of the agent who had charge of the company's business in that town, although the agent under his contract with the

company furnished both driver and horse, the wagon being the property of the express company.

In the Jahn case it was held that one who furnished a delivery wagon for a weekly compensation to a merchant for the delivery of merchandise sold, with the right to do other work, was not the servant of the merchant, who possessed no control or right of discharge over the driver; and in distinguishing that case from the Scofield case, the court in the opinion in Jahn's case, said:

"This conclusion is not in conflict with the opinion of Adams Express Co. v. Scofield (23 R., 1120), 64 S. W., 903. In that case the alleged independent contractor was the sole representative of the defendant at Shelby-ville and in complete charge of all its business at that point, and subject to its orders."

Construing the written contract in the light of these authorities, it is clear Alexander was not an independent contractor if he was delivering a register which had been repaired under the written contract between him and the company. If, however, he was delivering a register which he had repaired under a separate employment or contract with Shotwell, and not under his written contract with the company, he was an independent contractor and the company was not liable for the negligence of his chauffeur.

This view of the case requires an examination of the contract between Shotwell and the company, and a comparison of it with the contract between Alexander and the company.

Shotwell bought the cash register in question from the National Cash Register Co., on April 15, 1910, the contract taking the shape of a written order by Shotwell, which was accepted by the company, and containing the following provision:

"Should said register get out of order from ordinary use at any time within two years from date of shipment, you are quickly to repair it free of charge; undersigned to pay transportation charges on register to and from your factory or nearest agency capable of making necessary repairs or traveling expenses of repairmen in case undersigned desires repairs made where register is located."

The contract of sale contemplated three classes of repairs: (1) ordinary repairs made within two years after the sale of the register, for which no charge was

to be made; (2) extraordinary repairs made within the two years for which the buyer should pay; and (3) repairs of any kind made two years after the sale, and for these the customer should pay.

For the purpose, however, of having all kinds of repairs promptly made, section 17 of the contract between Alexander and the company required Alexander to promptly and properly make such repairs as he could make through his agency. That provision of the contract was evidently made in aid of the contract of sale with Shotwell above quoted, wherein the company agreed to make ordinary repairs for two years free of charge at its nearest agency capable of making the repairs.

Section 17, however, required Alexander to make the necessary repairs on registers, whether they were to be made free of charge, or otherwise; while section 18 expressly provided that the company should send bills direct to purchasers who should pay them directly to the company. This last quoted provision clearly means that in all cases where Alexander should make repairs for the company he should look to the company for his compensation; and if the company had the right to charge the purchaser therefor under its contract of sale, it would send the bill therefor direct to the purchaser, who in turn paid it directly to the company.

This construction of sections 17 and 18 conforms to section 19, which requires Alexander to make daily remittances to the company of all cash received by him for the company, including money received for repair parts and supplies sold.

It will thus be seen that section 19, in effect, contradicts Shephard, Alexander's bookkeeper, who testified that Alexander sells supplies and repair parts, which are his property, if, by that language, Shepard meant to say that Alexander could so conduct a repair business under the contract.

The case, therefore, comes to this; if Meadows was delivering a repair job which had been done by Alexander under the contract as above quoted, the delivery was done for the company, and it is liable for any negligence upon the part of Meadows in making the delivery. On the other hand, if Meadows was delivering a repair job made by Alexander individually, as Shepard says. and not under the contract, the company is not liable, since Alexander would have been, in that case an independent contractor.

Upon that issue the testimony was sharply conflicting Shotwell saying that no repairs were made for him, and that he paid for none, while Meadows says he collected the bill for a repair job from Shotwell, being corroborated in this by Shepard the bookkeeper, who made the entry crediting Shotwell's account with the money turned in by Meadows. There being an issue upon this controlling fact of the case, it should have been submitted to the jury.

Appellant insists, however, that the contract between Alexander and the company being wholly written, Shephard should not have been permitted to contradict it by showing orally that Alexander bought and paid for his repair parts and made repairs upon his individual account.

The rule which prohibits a written contract from being altered by parol testimony in the absence of fraud or mistake is not, however, applicable to controversies with strangers to the instrument; it applies only between the parties to the writing; 1 Greenleaf on Evidence, sec. 279.

The rule is stated as follows in 17 Cyc., 749:

"The rule excluding parol evidence to vary or contradict a written instrument applies only in controversies between the parties to the instrument and those claiming under them. It has no application in controversies between a party to the instrument on the one hand and a stranger to it on the other, for the stranger not having assented to the contract is not bound by it, and is therefore at liberty when his rights are concerned to show that the written instrument does not express the full or true character of the transaction. And where the stranger to the instrument is thus free to vary or contradict it by parol evidence, his adversary, although a party to the instrument, must be equally free to do so."

The rule was recognized in Strader v. Lambeth, 7 B. Mon., 589; Edwards v. Ballard, 14 B. Mon., 289; Provident Sav. Life Assurance Society, &c. v. Johnson, 115 Ky., 84, and Marks v. Hardy, 25 Ky. L. R., 1773; 28 S. W., 864.

Appellee, therefore, had the right to show what was done by Alexander in this particular transaction, and the arrangement between him and the company under which it was done, whether under the written contract, or otherwise; and the trial court did not err in so ruling.

For the error indicated, however, the judgment is reversed, and the action remanded for further proceedings.