INCOME LIFE INS. CO. *v.* MITCHELL.

(*Nashville*, December Term, 1934.)

Opinion filed February 23, 1935.

472

Goodpasture & Carpenter, of Nashville, for appellant.

Malone & Wade, of Nashville, and H. B. Frater, of Sparta, for appellee.

Mr. Justice Chambliss delivered the opinion of the Court.

This appeal from a compensation award raises three questions: (1) That the chancellor erred in hearing the case on oral testimony; (2) that the deceased employee was shot and killed while engaged in an attempt to commit a criminal assault beyond the scope of and not in the course of his employment; and (3) that he was not an employee, but an independent contractor.

1. The Chancellor properly heard the case on oral testimony. Code, section 6885, prescribes the procedure under the Compensation Law. The petition may be brought in the county court and heard before the judge or chairman. "Either party dissatisfied with the judgment of the Judge or Chairman may appeal as in other

civil cases to the next term of the Circuit Court," where it will be heard *de novo* "by the Circuit Judge without a jury and as other non-jury civil cases are heard in the Circuit Court." It is further provided that, at the option of the petitioner, an original petition may be filed "in either the Criminal, Circuit or Chancery Court of the County," in which event "the issue shall be made in the same manner, and the presiding Judge shall proceed to hear the case as provided in case of appeal from the County Judge or Chairman."

Nonjury civil cases are heard before the circuit judge on oral testimony, and it is plainly provided that these hearings before the chancellor shall be heard "in the same manner."

2. Luther Mitchell was the husband of petitioner Josie Mitchell. He was occupied in writing industrial insurance for the Income Life Insurance Company, a foreign company with a district office in Nashville. Under his arrangement with the company there had been assigned to him the territory described as "West Nashville," in which he was engaged in building up what is described as a "debit," that is, a group or body of insured from whom, after procuring them to take policies, it was his duty to collect the weekly premiums; his compensation being commissions fixed on the basis of a graduated percentage of the sums collected by him. He appears to have spent the morning of the day of his death in making his rounds on foot, as was his custom. At his home at noon he found Joe Marsh, a brother of his wife. He had driven to Nashville in a car, and it was arranged that he would drive Mitchell around that afternoon as he made his collection. They stopped on Pearl street,

in front of the home of Mary Rush, a Negro woman he had insured. Mitchell stepped in the door, and some words were exchanged, which Marsh did not hear. Then he saw the woman take a pistol from a dresser and fire, and Mitchell fell backwards out of the door. Marsh says Mitchell was never altogether out of his view. It was the theory of petitioner, sustained by the chancellor, that this was an accidental death of an employee in the course of his employment.

The defendant below relied on the testimony of Mary Rush, who testified that Mitchell came in her room, demanded payment, "cussed" her, and then tried to throw her on her bed and force intercourse with her; that she escaped from him, got the pistol and shot him. It was insisted that the death was thus brought about by conduct beyond the course of Mitchell's employment and noncompensable. If the chancellor had accepted the Negro woman's testimony, this conclusion would be correct, not only for the reason stated, but because the death was the result of intentional misconduct. But the chancellor has evidently accepted the version of witness Marsh, and, this being material evidence, this court will not disturb his finding, and, if this were the only issue presented, would affirm the judgment.

3. However, a third point is made for appellant, that he was not an employee; that his relationship was that of independent contractor. It is urged that the chancellor's holding on this point also is supported by material evidence, and, therefore, should be followed. But we find practically no conflict in the evidence bearing on this issue. Mitchell's status has already been outlined. It is clear that he was working under a contract

for the year, of which no complete written memorandum is produced, or appears to have been in existence. The only writing introduced is a letter addressed to Mitchell, and signed "R. B. Wilson, Manager," reading as follows:

"Dear Sir: Builder's Contract; ninety per cent collections fifteen dollars straight salary for the first thirteen weeks, if you have three dollars per week writing and ninety-five per cent average collections, no salary; the next thirteen weeks seventy per cent of collections, the next thirteen weeks fifty per cent of the collections and no salary; after that standard contract."

Wilson, who was the district manager of the insurance company, was introduced by petitioner and testified that this "Builder's Contract" with Mitchell called for writing insurance and collecting premiums in West Nashville, his assigned territory, where he was to "build" a "debit," that is, establish a group of business; that Mitchell had been thus employed for 31 weeks, up to the day of his death, April 2, 1934; that he was to build his debit of industrial insurance, weekly payments, life, accident, and health, and to be paid commissions from his collections, as indicated; that he was furnished with forms for applications and for making collection reports; that he would turn in applications and frequently deliver the policies, then follow with weekly collections. He testified, further, that this was a 52-week "builder's contract," and that he did not understand that the company could discharge such a contractor at will; that when Mitchell was killed he was not on a salary, but was drawing 75 per cent "straight commission;" that neither he nor the company had any control

over the details of the work, nor as to when or from whom Mitchell made collections, the only requirement being that he report once a week and pay in his collections, less his commission. He testified that the company had no interest except in the results, and no control over when or where Mitchell worked, whether day or night, long or short hours, and that there was no stipulation as to the volume of business, the compensation being on a commission basis; that regarding claims, Mitchell was not obligated to act at all, and if he did so it was because it was sometimes thought to be to his interest to have this contact with the insured. He further testified that while regular agents of the company were subject to rules and regulations, these "organizers" or "builders" of debits, were more or less "free lances;" that the more they got, the better for them, and they were supposed to be controlled by this consideration.

In view of this statement of the arrangement between the parties, which we think accurate, in all material respects, What, as a matter of law, was the relationship?

██ ██ This court has dealt with this question, often close and difficult, in numerous reported cases arising under the Compensation Law, and has more than once said that its determination turned upon the facts of the given case. However, certain cardinal rules govern. Where employment appears, the burden is on the employer to establish an independent contractual relationship. *Sledge* v. *Hunt*, 157 Tenn., 606, 12 S. W. (2d), 529. The method of payment is not conclusive. *Finley* v. *Keisling*, 151 Tenn., 464, 473, 270 S. W., 629; *Frost* v. *Blue Ridge Timber Corporation*, 158 Tenn., 18, 11 S.

W. (2d), 860. The right to discharge, or the absence of such right, is a circumstance of much importance. *Odom v. Sanford et al.,* 156 Tenn., 202, at page 210, 299 S. W., 1045.

Upon analysis of all our decisions, it will be seen that the determinative distinction to be kept in mind is that between the reservation in the employer of the right to control as to results only; and the right to control or direct as to the means and methods by which the work of the employed shall be done. MR. JUSTICE MC-KINNEY deals clearly with this distinction in *Odom v. Sanford, supra,* at pages 211 to 213 of 156 Tenn., 299 S. W., 1047, and see *Mayberry v. Bon Air Co.,* 160 Tenn., 459, 26 S. W. (2d), 148; *Phillips v. Tennessee Eastman Corporation,* 160 Tenn., 538, 26 S. W. (2d) 1051. And this court has approved more than once this statement of the rule by MR. JUSTICE LURTON in the leading case of *Powell v. Construction Co.,* 88 Tenn., 692, 697, 13 S. W., 691, 692, 17 Am. St. Rep., 925; "In every case, the decisive question is, had the defendant the right to control, in the given particular, the conduct of the person doing the wrong?" While this was a case arising under the law of master and servant, before the compensation statutes were enacted, the principle is the same and applicable here. Again, in the recent compensation case of *Marshall v. Lumber & Coal Co.,* 164 Tenn., 267, 47 S. W. (2d), 553, 554, in holding that the injured employee was not at the time an independent contractor, MR. JUSTICE GREEN reasoned thus: "In theory of law, we think there was no doubt of defendant's right to control plaintiff in the execution of this work. Defendant might have discharged plaintiff from this work,

or ordered him to do the work in any manner desired.'' *American Savings Life Ins. Co.* v. *Riplinger* (1933), 249 Ky., 8, 60 S. W. (2d), 115, 117, cited for appellant, is in point. The employee Owens' ''contract authorized him to sell, on commission, insurance for the company.'' The company reserved the right to discharge, or terminate the contract at any time, as it did not here. The court said: ''The right of control of the means of doing the work, or want of it, is the determinative factor when considering the relationship.'' Finding that Owens ''could go or come in any manner he chose,'' that ''his mode or means of travel in the selling of insurance . . . was a matter left entirely to Owens,'' that ''he could go to work at whatever hour he desired and work as he desired, either day or night,'' etc., Owens was held not to be a servant or employee, but an independent contractor. Cases like *Williams* v. *National Cash Register Co.*, 157 Ky., 836, 164 S. W. 112, and *Singer Mfg. Co.* v. *Rahn*, 132 U. S., 518, 10 S. Ct., 175, 33 L. Ed., 440, were distinguished, saying that, in the latter case, the employee agreed to give all his time and services to the company, and the company reserved in the contract the right to ''prescribe not only the business he should do, but the manner in which he should do it,'' even the route he should take, and speed at which he should drive.

Turning now to the facts of the instant case, wherein can there be found a reservation in the insurance company of the right to control Mitchell in the performance, the working out of his contract to build this insurance debit? The interest of the company appears to have been solely in the securing of applications from insurers, and the collection from them of its proportion of the

premiums the net result. It exercised no supervision and gave no direction as to whom to see or where to be seen, how to be urged or induced; whether Mitchell should walk, as he commonly did, or ride, as he did this fatal day; whether he should solicit whites or blacks, or both; and, with special reference to the conduct of Mitchell "in the given particular" here pertinent, whether he should enter homes, or remain outside, where in this case, at least, he would have been safer. He was free, so far as the company had rights of control, to go at night into the more dangerous quarters of the city, and incur the dangers incident, or to confine himself to usual daylight hours of work. It is true that he was required to use, and of necessity must use, the forms and blanks of the company, and the contracts he was authorized to make for insurance were so limited, but these were matters relating to what he was to do, not the method of his doing. The plans and drawings furnished a contracting builder of a house furnish an analogy.

Counsel for petitioner rely upon *Larke* v. *John Hancock Mutual Life Ins. Co.*, 90 Conn., 303, 97 A., 320, L. R. A., 1916E, 584. This was a case of award of compensation for the death of an insurance solicitor and collector from injuries suffered *en route*. But the independent contractor issue was not raised or discussed, and perhaps for the reason that the facts found show that by his contract "he was under the supervision of Mr. Radie, the district manager for the company, *who laid out the route for him from day to day.*" (We italicize determinative language.) And when injured he was following a directed route under unusual conditions which directly brought about his injury. And so of *Case*

*of Moran,* 234 Mass., 566, 125 N. E., 591. This was a case of an insurance solicitor and collector injured by a street car. But he left home "to make certain collections and to solicit some 'ordinary insurance' which his superior officer desired him to obtain that day. His employment compelled him 'to make use of the public streets and to ride in street cars,'" etc. Here, again, the question of independent contractor was not presented or considered, and it appears that he was acting directly under a superior officer as to whom he was to visit, and, therefore, where he was to go that day, and he was "compelled" to travel as he was doing. This case, also, is therefore not in point here. The essential factor of reserved, and exercised, right of control in the particulars of the performance of the work he was doing when injured appeared in that case, as it does not in the instant case. We are cited no case on its facts similar to that now before us in which an award has been sustained.

We are unable to agree with the learned chancellor in his application of the law to the uncontroverted facts which, in our opinion, show the relationship of independent contractor, and the decree must be reversed.