Morrison *v.* National Life & Accident Ins. Co.*

(*Nashville*, December Term, 1939.)

Opinion filed April 6, 1940.

---

*Designated for publication June 10, 1942.

See, also, 179 Tenn., 29, 162 S. W. (2d) 501.

WILLIAM GERBER and JOHN L. EXBY, both of Memphis, for plaintiff in error.

ARMSTRONG, McCADDEN, ALLEN, BRADEN & GOODMAN and KING, KING & LAUGHLIN, all of Memphis, for defendant in error.

MR. SPECIAL JUSTICE EDWARD J. SMITH delivered the opinion of the Court.

In the early afternoon of Monday, July 20, 1936, a motorcycle operated by Morrison, a police officer of Memphis, collided with an automobile owned and operated by Darby, an insurance solicitor of the National Life and Accident Insurance Company in Memphis, under such

circumstances that Morrison instituted an action for personal injuries against the Company and Darby.

At the conclusion of the evidence, the Company moved for a directed verdict.

Intimating that if the collision occurred within the limits of Darby's "debit," he would deny the motion, the trial judge held that as it occurred beyond such limits, and while Darby was on a mission to collect a premium on an ordinary life insurance policy, he was an independent contractor, for whose negligence the Company was not responsible.

He based this conclusion on *Powell* v. *Virginia Construction Co.*, 88 Tenn., 692, 13 S. W., 691, 17 Am. St. Rep., 925, and *American National Insurance Co.* v. *Denke et al.*, 128 Texas, 229, 95 S. W. (2d), 370, 107 A. L. R., 409.

After the motion of the Company for a directed verdict had been sustained, the plaintiff took a nonsuit as to Darby.

Conceiving that the case was controlled by *Income Life Insurance Co.* v. *Mitchell*, 168 Tenn., 471, 79 S. W. (2d), 572, and citing and strongly relying on *American National Insurance Co.* v. *Denke, supra*, the Court of Appeals affirmed the judgment.

The petition of Morrison for *certiorari* was granted and argument has been heard.

█ As it must be conceded that under a contract of employment one may be an agent in the discharge of some duties, and an independent contractor in the discharge of other duties, (*Allen* v. *Chamberlain*, 134 Tenn., 438, 183 S. W., 1034, *Marshall* v. *South Pittsburg Lumber & Coal Co.*, 164 Tenn., 267, 270, 47 S. W. (2d), 553), the question to be determined is whether Darby occupied the latter status at the time and place of the collision.

For the more convenient transaction of the Company's business, the city of Memphis was divided into four districts, each in charge of a district manager, under whom were four or five superintendents, and under each superintendent were five or six insurance solicitors of the class to which Darby belonged.

The solicitors were assigned (1) to certain defined territory in Memphis, called a "debit," in which they solicited industrial insurance, collected the premiums, and adjusted claims, and (2) they were qualified by the Company to solicit, and under conditions presently to be stated, to collect premiums on ordinary life insurance policies obtained by them, or, if obtained by other agents, assigned to them.

The home office of the Company prepared two printed forms, the first entitled "Application for Agency," and the second "Agent's Agreement," copies of which were introduced in evidence by the plaintiff.

In the caption of the application for employment this sentence appears: "The information asked for herein is to enable the Company to determine as accurately and as quickly as possible your availability and adaptability to the work and duties that may be assigned to you, if employed."

Many questions relative to the physical condition of the applicant, his family relations, his church, club, and fraternal affiliations, and his general financial condition appear in the application.

Two questions were: "4-f. Have you an automobile? . . . 15. Do you purpose to devote your entire time to the business of this Company?"

The agreement required the agent: (1) To canvass for insurance, and collect premiums during each and

every week obtained by or assigned to him, to aid in the proper adjustment of claims arising in his "debit," to act for the Company, only, and to engage in no other business during the time of his employment; (2) to pay each day all monies collected; (3) to forward each week a list of all policies on which the premiums were four weeks in arrears; (4) to take no applications except upon the lives of persons seen by him, and believed by him to be in good health; (5) to obey the orders and conform to the directions, rules and regulations of the Company in force at the time of the agreement, or that thereafter might be made; (6) the Company furnished an "Agent's Instruction Book," and the agent agreed to be governed in all his relations with the Company by the directions it contained; (7) the Company reserved the right to terminate the contract of agency at its pleasure, and without notice; (8) the agent was to receive commissions for his services, graduated in accordance with the amount of business he did, and the collections he made.

The solicitors were required to report each morning at the district office before going to their respective "debits," and they were required to devote Monday and Tuesday of each week to making collections in the "debit," and if these two days did not suffice, Wednesday of each week was devoted to this purpose.

The better to acquaint solicitors with the "debit," a superintendent would accompany a new agent, and train him for a period of about two weeks, and thereafter would accompany him about once a month for the purpose of checking the collections as reported by the agent.

The solicitors were required to meet at the district office, three or four times each week, to receive instructions as to how to increase business, these instructions covering all kinds of insurance.

The Company employed approximately one hundred solicitors in Memphis, and it appears from the evidence that forty-five of forty-six employed in the two districts devoted to white business had automobiles. No proof was offered on this point as to the solicitors employed in the two districts devoted to colored business.

Among the witnesses introduced by the plaintiff were Woodis, Parks and Hull, former solicitors of the Company.

They testified that all solicitors were required to sign the application containing the question, "Have you an automobile," and the two first named further testified that while they did not have automobiles when they were employed they obtained them within a short time, as they could not otherwise discharge the duties assigned to them, and further that superintendents inspected their automobiles before they were put in use.

Parks testified that he was employed by Knight, the district manager, who also employed Darby, and when asked if he had an automobile, and he replied that he did not, Knight said that it would be necessary to have one due to the large territory embracing Parks' "debit."

Woodis and Parks also testified that premiums on ordinary life insurance policies written by them were collected by them, as were also such premiums on policies written by other agents, and assigned to them.

Hull testified that he also signed an application containing the question, "Have you an automobile?"

We quote Hull:

"Q. When you went to work for them, who did you apply to for the position? A. I went to Mr. Land in the Farnsworth Building, and he recommended me to Mr. Dunlap.

"Q. To Mr. Dunlap? A. Yes, sir.

"Q. Was there anything said to you about having an automobile? A. Yes sir. He asked me did I have an automobile and I told him yes.

"Q. Did he say anything about it being necessary to have an automobile to work for the Company? A. Yes sir, he said it was essential, to use an automobile to work for the Company."

And again, on cross examination this was developed:

"Q. And when you would use the automobile in the evening and go back on the back collections, you did that because you wanted to, and it was more convenient to you? A. Mr. Dunlap told me that it would be essential to have an automobile to make my back collections."

Dunlap, one of the district managers, who had the same power and authority to employ solicitors as did Knight, was not called as a witness.

Knight, the district manager, in charge of the territory in which Darby worked, testified that some of the solicitors working in his district had automobiles, and others did not. He was asked to name the solicitors who did not have automobiles, and he gave the name of Howell.

He stated that he did not know why the question, "Have you an automobile" was contained in the application; and that the Company did not make any allowance for the cost of operating or maintaining automobiles of solicitors, who owned their own cars which were registered in their names.

As to the duties of solicitors relative to ordinary life insurance, Knight testified that the Company procured for them a license which authorized them to write such insurance anywhere in Tennessee; that they paid the Company the license fee, and that they were only paid commission, fifteen per cent of their collections, and

twenty-five per cent on the increase in industrial insurance, and a minimum of twenty-five per cent of the premium on an ordinary life insurance policy which was increased to fifty per cent under conditions stated by the witness.

Knight further testified that in case of ordinary life insurance, the premiums of which were paid monthly, quarterly, semiannually, or annually, the home office at Nashville would write to the insured, informing him of the maturity of the premium, and the district office at Memphis would receive like information from the home office.

The district office also would write to the insured stating the due date of the premium, and a clerk frequently would call the insured. If payment was not made at the office, the solicitors would procure a list of the maturing premiums, and while they were not directed to collect the premiums, they had the right to do so when and if they pleased, and if collections were made they received commissions.

Knight also testified that many premiums had been assigned to Darby to collect which he said Darby was free to collect if he chose to do so.

We quote from his cross examination:

"Q. Do you seek to imply here, Mr. Knight, that you turned over a lot of business to Mr. Darby, or any one of those agents, and he is at liberty to do nothing, and if he don't want to, not to collect the commissions? A. If he sat down and didn't get results he would not be up there.

"Q. That is right. You expect him when you turn these particular customers over to him, you expect him to go out and work for it. A. I thought I explained that a while ago."

Darby testified that he obtained cards at the district office, showing the names of persons having ordinary life insurance, the dates of the premium maturities, and the amounts of the premiums, and if the premiums were not paid he called on the insured, and collected the premiums, the Company furnishing him printed forms of receipts which he signed in the Company's name, and gave to the insured on payment of the premium.

On the date of the collision, Monday, July 20, 1936, Darby had been working in his "debit" during the morning hours, and about noon he was going home to lunch when he remembered that a quarterly premium of an ordinary life policy, issued to Mr. George Allen, who lived on Lucerne Street, had matured.

He had been to the Allen house several days previous to collect the premium, but on that occasion, he was told by Mrs. Allen that her husband would have a pay day in a few days when he could come and collect the premium.

The Allen policy was issued in 1934. Wallace, the former agent, who procured the policy, had been transferred to Mississippi, and when Wallace's "debit" was assigned to Darby, he, according to Mrs. Allen, had always collected the premiums when they lived on Lucerne Street, as well as when they lived on Edith Street and Lauderdale Heights.

Viewing the evidence, as we must, in the light most favorable to the plaintiff, the application for employment reasonably can be construed to the effect that the ownership of an automobile by the applicant was deemed material by the Company, and indeed, according to the witness Hull, Dunlap, a district manager in Memphis, stated that it was essential for an applicant to own an automobile before he would be employed by the Company.

Bearing in mind that the solicitors were employed to work in both fields of insurance, and that the Company required only one form of application for employment to be executed, the qualifications exacted for the industrial field presumably were exacted for the ordinary life field.

At least a reasonable inference to that effect may be drawn from the evidence, and that being so the trial judge erred in granting the motion of the Company for a directed verdict.

This conclusion renders it unnecessary to discuss cases bearing more or less on the question now under consideration, as, of course, each case must turn on its own special facts and circumstances; but no case is cited, nor have we found one, in which the rules of the Company required agents to use automobiles.

It may be noted that on facts somewhat similar to the ones here presented, there is a decided conflict in the authorities. *American Sav. Life Ins. Co.* v. *Riplinger*, 1933, 249 Ky., 8, 60 S. W. (2d), 115; *American National Ins. Co.* v. *Demke et al.*, 1936, 128 Tex., 229, 95 S. W. (2d), 370, 107 A. L. R., 409 annotation; *Schroeder et al.* v. *Rainboldt et al.*, 1936, 128 Tex., 269, 97 S. W. (2d), 679; *Kennedy et al.* v. *American National Insurance Co.*, 1937, 130 Tex., 155, 107 S. W. (2d), 364, 112 A. L. R., 916 annotation; *Vert* v. *Metropolitan Life Ins. Co.*, 1938, 342 Mo., 629, 117 S. W. (2d), 252, 116 A. L. R., 1381 annotation; *Miller* v. *Metropolitan Life Ins. Co.*, 1938, 134 Ohio St., 289, 16 N. E. (2d), 447; *Hall* v. *Sera*, 1930, 112 Conn., 291, 152 A., 148; *Dillon* v. *Prudential Ins. Co.*, 1925, 75 Cal. App., 266, 242 P., 736.

It is not necessary to consider *Income Life Insurance Co.* v. *Mitchell*, 168 Tenn., 471, 79 S. W. (2d), 572, further than to state that the facts presented in the present

record differ so materially from the facts considered in that case as to render it wholly inapplicable here.

Before closing the opinion we wish to add that the Court is in thorough accord with the rule stated in Section 250, Restatement of the Law of Agency.

For the reasons stated, the judgment of the Court of Appeals affirming the judgment of the circuit court is reversed, and the case remanded for a new trial.

The respondent will pay the cost of the appeal.