Phyllis Lee STRATTON, widow of
Charles Neal Stratton,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 534.

United States District Court
E. D. Tennessee,
Winchester Division.

Nov. 2, 1962.

T. Arthur Jenkins, Manchester, Tenn., for plaintiff.

J. H. Reddy, U. S. Atty., Ottis B. Meredith, Asst. U. S. Atty., Chattanooga, Tenn., for defendant.

NEESE, District Judge.

This is an action for damages against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 et seq., for the wrongful death of the plaintiff's husband while he was employed by ARO, Inc., at the Arnold Air Engineering Development Center. The Center, located near Tullahoma, Tennessee, is a government-owned facility managed, operated and maintained as to test facilities and related utilities by ARO, Inc.,

under a fixed fee contract with the Air Research and Development division of the United States Air Force.

The Court finds from the agreement of the parties that ARO, Inc., exercising an independent employment, contracted with the Air Force to operate the Center according to ARO's own methods without its being subject to the control of the Air Force, except as to the result of the work. Casement v. Brown (1893), 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582, 585; Powell v. Virginia Construction Co. (1890), 88 Tenn. 692, 13 S.W. 691, 17 Am.St.Rep. 925; McHarge v. N. M. Newcomer & Co. (1906), 117 Tenn. 595, 100 S.W. 700, 9 L.R.A.,N.S., 298. This operating contractor procured and provided, either directly or by subcontract, personnel, material and services therefor necessary to establish an operating plan and provided an organization to manage, operate, maintain and administer activities contemplated by the parties to be necessary for the normal operation of the Center.

Among other duties ARO, Inc. assisted the government's contracting officer in formulating testing programs, scheduled and performed all work incident to conducting non-aerial tests, performed all services in connection with data reduction and processing, and delivered the resulting data to recipients specified by such contracting officer. This included the provision by ARO, Inc. of a disaster plan reasonably to protect the test facilities from damage or destruction by fire.

The contractor procured a water valve (herein referred to, for clarity, as the device) and installed it in the remote "boondocks" area of the Center as a part of a fire prevention system. The obvious purpose of this system was to enable personnel of the Center to release by means of electrical controls a deluge of water in and on a particular testing area of the facility in the event of fire.

The device was of the "fail-safe" design being constructed so that a failure of the mechanism would release great quantities of water to extinguish a fire in the area served. It would open in-

stantaneously and become operative by means of constant water pressure in the system's water line unless held in a closed position by air pressure. The critical mechanism in the device was a shaft attached to a diaphragm enclosed within a cylinder which opened or kept closed the device depending on whether air pressure from a controlled source was applied either above or below the diaphragm. The flow of pressurized air above or below the diaphragm was directed, in turn, by an electrically-operated solenoid valve. The device was designed to withstand some 200 pounds of water pressure per square-inch but only 12 to 15 pounds per square-inch of air pressure were required to keep the device closed and to prevent the flow of water therein. The diaphragm and its enclosing cylinder were designed to withstand air pressure of 100 pounds per square-inch.

There being no central pressure system to supply outside air to the device, the contractor served it from a truck parked in the area which was loaded with numerous cylinders of pressurized inert gas (nitrogen, in this instance). Each of these cylinders was connected to a central supply line.

When this device was being installed and checked by ARO, Inc., it was discovered that the device had a malfunction within the solenoid control. Air (nitrogen gas) was leaking from the solenoid control which resulted in the application of unwanted pressure to the diaphragm. This malfunction had caused the testing area served to be flooded with water unintentionally while the operation of the device was being checked. The water supply to the device was then cut off, and one of the supervisors for ARO, Inc. undertook to repair the malfunction in the solenoid valve. Because of the wastage of nitrogen gas from the central supply due to the malfunction, the device was detached from the central supply line running from the parked truck, and an individual cylinder of nitrogen gas was attached to supply the device with air.

On June 5, 1958 the ARO, Inc., supervisor was unable to remedy the malfunction before his hours of work came to an end, and the plaintiff's husband was thereafter dispatched to the scene to undertake a completion of the remedial work already begun. Another employee of ARO, Inc. was also dispatched to the trouble spot to assist the plaintiff's husband.

Neither the Air Force nor the contractor had promulgated rules or regulations concerning safe methods of operating this type of device; however, pursuant to an inter-Center memorandum, ARO's personnel had been instructed to "tag" any equipment which might be hazardous and require particularly cautious handling. This device, however, was not thus "tagged" even after the nitrogen gas leak was discovered. It does not appear that at any time previous to the accident herein that personnel of the Air Force had any knowledge or notice of any malfunctioning in the device.

In the process of correcting the malfunction, the plaintiff's husband (Stratton) stood near and somewhat over the device and discussed with his fellow-employee the problem encountered. The fellow-employee was slightly removed from the device while engaged in operating the valves on the nitrogen gas cylinder. The arrangement of the gauges and controlling valves on this cylinder of nitrogen was such that a person not thoroughly familiar with the valving might become confused as to the function of each valve. One of them, the regulator valve, reduced and limited the pressure applied on the line servicing the device, while the other valve merely controlled the flow of the nitrogen. The ARO, Inc. supervisor, who had commenced the repair work on the device, had installed a "high-pressure" regulator valve which would permit application of a higher pressure on the device than its rated capacity, although a low-pressure regulator was indicated for this type of installation. The aforementioned supervisor had suggested to his superiors that

this type of low-pressure regulator should be substituted in place of the one he had installed on a temporary basis. Reiterating, these gauges and their controlling valves were so positioned that one not completely familiar with the arrangement might have opened one valve, while acting under the impression that the pressure thus released was indicated by the other gauge.

At one point in the corrective efforts, Stratton requested his fellow-employee to release more nitrogen from the cylinder. On being informed that the regulating valve on the cylinder line registered "0", Stratton expressed his opinion that the cylinder might be empty. Quickly thereafter the dome or lid of the device was blown off from pressure inside the device, striking Stratton's face. From injuries thus sustained, Stratton died five days afterward, on June 11, 1958.

An investigating team, assembled by ARO, Inc., conducted an inquiry into the cause of the accident. ARO's safety director expressed his opinion that the air-pressure control line of the device should properly have been equipped with a relief valve to allow excessive air to escape, and that the device should have been "tagged" in compliance with the aforementioned inter-Center memorandum when the malfunction was discovered. There was no further showing as to the proximate cause of the accident.

It is not unreasonable to infer from the facts proved that Stratton's fellow-employee misconstrued the reading on one of the gauges while opening the air supply on the other, which directly served the device. However, as that conclusion is not essential to a determination of the issue before the Court, such finding will be pretermitted. The Court finds no competent proof in this record even remotely suggesting that any employee of the United States was guilty of any act or omission which contributed in any manner to cause the accident in which Stratton was injured.

The principal contention of Stratton's widow now seems to be that the United States is liable because ARO, Inc., was acting, not as an independent contractor, but as the government's agent in the establishment and operation of the safety program utilized at the Center when this accident occurred. As stated, supra, the Court disagrees. Item 44 of the contract between these parties merely requires the contractor to " * * * conform to all safety regulations and requirements covering such premises [on which any part of the contract might be performed on property directly controlled by the government] in effect at any time * * * " during the life of the agreement. Conversely to the plaintiff's contention, under the contract the burden was placed on and accepted by ARO, Inc., to " * * * take all reasonable steps and precautions to prevent accidents and preserve the life and health of Contractor and Government employees performing or in any way coming in contact with the performance of this contract on such premises"; and violation by the contractor of this provision, unless promptly corrected as directed by the government, furnished grounds for the termination of the agreement by the government.

While it is conceivable that ARO, Inc. might have been the government's agent in the discharge of some duties and an independent contractor in the discharge of others, Morrison v. National Life and Accident Insurance Co. (1940), 179 Tenn. 18, 162 S.W.2d 497, 497–498, the Court finds this was not true in the situation at bar. It is clearly understandable that the government would include in its contract with this contractor provisions relating to safety measures; because, if ARO, Inc. had created or maintained a nuisance on government property by the utilization of improper safety regulations, the government could well have lost the protection gained in the independent contractual relationship with ARO, Inc. to its detriment. See: Powell v. Virginia Construction Co., supra, 88 Tenn. at p 697, 13 S.W. at p. 692.

The plaintiff originally theorized that the government, as owner of the prop-

erty involved, owed a nondelegable duty to Stratton and other invitees properly on its property by virtue of the danger inherent in the device which burst and injured her husband. (This is not adverted to in the plaintiff's final brief.)

 It is abundantly true that in certain cases the doctrine of absolute liability, or liability without fault, may require a person to respond in damages for injuries resulting from properly conducted activities if such be deemed "ultrahazardous". In such event the degree of care used in performing the activity is irrelevant to the application of this theory of liability. But, this rule applies to private persons and not to actions brought against the United States under the Federal Tort Claims Act, supra.

The sovereign has immunity from suit without its consent. The extent of the consent granted by the Federal Tort Claims Act does not extend to situations of strict liability, in the absence of fault, for an unusual or dangerous activity; thus, liability under this Act cannot arise by virtue of ownership by the United States of "an inherently dangerous commodity" or property, or of engaging in an "extra-hazardous" activity. United States v. Hull, C.A.1st (1952), 195 F.2d 64, 67, cited with approval in Dalehite v. United States (1953), 346 U.S. 15, 73 S.Ct. 956, 97 L. Ed. 1427; Pierce v. United States, D.C. Tenn. (1956), 142 F.Supp. 721, 734, affirmed C.A.6th, 235 F.2d 466. Negligent acts on the part of governmental employees were found to have been present in Pierce, supra, and the recovery in Dalehite, supra, was reversed on another theory. The Supreme Court emphatically construed the Federal Tort Claims Act nonetheless as creating no liability on the part of the government where, as in the case at bar, none of its employees is at fault. Dalehite, supra.

If it should be contended that the defendant is entitled to a recovery under Tennessee law, the same prohibitory rule applies. The general rule in Tennessee is that negligence, to be actionable, must result in damage to the plaintiff which the defendant could reasonably have anticipated or foreseen. Tidwell v. Kay's of Nashville (1952), 194 Tenn. 205, 250 S.W.2d 75, 77, citing Moody v. Gulf Refining Co., 142 Tenn. 280, 218 S.W. 817, 8 A.L.R. 1243 and Jones v. Stewart, 183 Tenn. 176, 191 S.W.2d 439.

Finding specially and concluding that the plaintiff is entitled to nothing under her complaint, the United States attorney will submit for consideration, agreeably to the local rules of the court, a proposed order of judgment taxing the plaintiff with the costs hereof.

This memorandum opinion serves as the required special findings of fact and conclusions of law.